UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-80136-CR-Rosenberg/Reinhart

UNITED STATES OF AMERICA,

      Plaintiff,

v.

BRIAN SIGOUIN,

      Defendant.

_____/

**AMENDED REPORT AND RECOMMENDATION ON MOTIONS TO SUPPRESS[1]**
**[DEs 20, 21, 22, 32]**

    Brian Sigouin is charged by indictment with one count of receiving child pornography and three counts of possessing child pornography.  He moves to suppress physical evidence seized pursuant to a search warrant as well as post-*Miranda* statements he made to FBI agents on the day of the search.  This matter was referred to me by the Hon. Robin L. Rosenberg.  DE 6.  I have reviewed the Motions to Suppress, the Government's Responses, and Mr. Sigouin's Replies.  I conducted an evidentiary hearing on December 9 and December 16, 2019.  I am fully advised and the matter is ripe for decision. For the reasons stated herein, it is RECOMMENDED that the motions to suppress be DENIED.

**BACKGROUND**

    On May 15, 2018, I issued a search warrant for the residence located at 22809 Horseshoe Way, Boca Raton, Florida ("the Target Residence").  DE 26-1 at 24-27.  The affidavit in support

---

[1] The Court amends the Report and Recommendation entered at Docket Entry ("DE") 45 solely to correct three minor errors in capitalization and to insert a missing parenthesis into a case citation.  No substantive changes have been made.

of the warrant alleged that there was probable cause to believe that an IP address associated with the Target Residence was being used to access child pornography from a publicly-accessible, distributed peer-to-peer online network ("the Network").[2]  *Id.* 1-21 (hereinafter "Affidavit"). Incorporated into the Affidavit was a peer-reviewed academic article discussing the use of statistical methods to detect a person downloading child pornography over a distributed peer-to-peer computer network.  DE 26-5; Aff. ¶ 23 & n. 4

*The Affidavit and the Peer Reviewed Article*

The Affidavit explained that any person could join the Network by downloading and installing publicly available software.  Aff. ¶ 7.  When users join the Network, they connect their computer to other computers running the same software, such that each computer becomes a node in the larger Network.  DE 26-5 at 2.  Each computer/node becomes a "peer" of the other computer/nodes.  *Id.*  Each computer/node contributes a portion of its local hard drive to be used as storage by the Network.  *Id.*; Aff. ¶ 8.  A node can operate in "opennet" or "darknet" mode.  In "opennet" mode, anyone who joins the Network can connect to the node in question, including persons who are not known to the owner of the node.  In "darknet" mode, only persons who are preapproved by the owner of the node can access it.  Aff. ¶ 14; DE 26-5 at 2.

When a file (including digital images of child pornography) is uploaded to the Network, the file is divided into encrypted "blocks."  Aff. ¶ 9; DE 26-5 at 2. The encryption process assigns a unique alphanumeric value to each block, which is called the block's "hash" value.  DE 26-5 at 2.  The blocks are then distributed to hard drives on multiple nodes on the Network.  *Id.*;

---

[2]The Government is conducting ongoing covert investigations on the same network using the same techniques as in this case.  To protect the integrity of those investigations, the parties and the Court have agreed to reference the network in question simply as "the Network" and to redact all references to the true name of the network.

Aff ¶ 11.  The hard drive may be on a peer computer connected directly to the uploading node, or it may be connected indirectly through other nodes.  Aff. ¶ 11.  A list of the hash values for all the blocks necessary to reconstruct the image is stored in a "manifest", which is a separately-encrypted file that is stored on the Network.  *Id.* ¶ 9; DE 26-5 at 2.  The Network assigns a unique public address to the manifest.  Aff. ¶¶ 16-17; DE 26-5 at 2.  Anyone who obtains the unique public address can locate the manifest, decrypt it, and then request the blocks (by hash value) necessary to reconstruct the image.  DE 26-5 at 2.  These public addresses are listed in various locations on the Network.  Aff. ¶¶ 16-18.

Once a person has the manifest, he can download the corresponding digital images of child pornography.  Aff. ¶ 11; DE 26-5 at 2.  To do so, the person's computer sends out a request (using the relevant hash values) for all the blocks associated with that image.  This request first goes to the computers/nodes directly connected to the requesting computer (the first-generation neighbors).  If a first-generation neighbor has the requested block, the Network software on that computer sends the block to the requestor.  If a first-generation neighbor does not have a requested block, the Network software on that computer forwards the request to the computers/nodes connected to it (the second-generation neighbors).  If the second-generation neighbor has the requested block, it sends the block to the first-generation neighbor, who then passes it to the requestor.  If the second-generation neighbor does not have the requested block, the request is forwarded to the computers/nodes connected to the second-generation neighbor (the third-generation neighbor).  This process continues until the earlier of (1) all the blocks are retrieved or (2) a fixed number of generations has been queried.[3]  For each iteration, the

---

[3] The Network uses a counter called "hops-to-live" (HTL), which is initially set to 17 or 18. Aff. ¶ 13.  Each time a node forwards a request, it decreases the HTL by 1.  If the HTL reaches

Network's software forwards the requests and/or returns the blocks automatically, without the knowledge of the owners of the non-requesting nodes. *See generally,* Aff. ¶¶ 11-13; DE 26-5 at 2.

The software "warns its users in multiple ways that it does not guarantee anonymity: when the software is initially installed; within the log file each time [the Network] is started; and via [the Network's] publicly accessible website." Aff. ¶ 15. Additionally, the "fact that [the Network] does not mask IP addresses is explained on its publicly available website. [The Network] also acknowledges on its publicly available website that, for users who use the Opennet mode, it can be statistically shown that a particular user more likely than not requested a file (as opposed to having merely forwarded the request of another peer) based on factors including the portion of the pieces of a file requested by a user and the number of nearby pieces." *Id.*

The Affidavit further explained that, without judicial prior approval, the FBI had set up a computer as one of the nodes on the Network ("the FBI node"), which allowed the FBI to monitor requests for child pornography as they flowed across the Network. The computer on the FBI node ran a version of the Network software that had been modified to filter and log certain information. Specifically, for a user connected to the FBI node, the modified software logged "the IP addresses of the user's peers; the number of peers those peers report to have; a unique identifier assigned by the software (referred to as the computer's [the Network] "location"); the remaining number of times a request for a piece of a file may be forwarded; the date/time of

---

0, the request is no longer forwarded and a "fail" message is returned to the original requestor. DE 26-5 at 2.

requests received from a peer; and the digital hash value of a requested piece." *Id.* ¶ 19. The FBI node did not collect any information that was unavailable to other peers of the user. *Id.*

The FBI had compiled a list of hash values associated with blocks known to contain child pornography ("files of interest"). *Id.* ¶ 21. If the FBI node detected a request for a block whose hash value corresponded to a file of interest and whose HTL value was 17 or 18, further investigation was conducted using a mathematical algorithm to identify whether there was a reliable circumstantial inference that a particular node was requesting known images of child pornography (as opposed to passively forwarding a request by someone else). *Id.* ¶¶ 21-22. The most relevant information incorporated into the algorithm was (1) the total number of blocks in the manifest for the digital image, (2) the number of blocks requested by the target node, (3) the time period during which those blocks were requested, and (4) the number of first generation neighbors for the target node. DE 26-5 at 3. The theory behind the algorithm was: if, during a condensed period of time, a node connected directly to the FBI node requested a particular percentage of the total blocks needed to reconstruct a known digital image of child pornography, there is a circumstantial inference that the connected node is the original requestor seeking the digital image. *Id.*

The Affidavit stated, "The academic paper's detailed evaluation finds that a formal mathematical formula based on this reasoning is highly accurate (specifically, it has a high true positive rate and a low false negative rate)." Aff. ¶ 23. The affiant also swore that evidence of child pornography crimes had been found in dozens of searches derived from using this algorithm to identify IP addresses that were seeking child pornography over the Network. *Id.* ¶ 24. The authors of the peer-reviewed article tested the algorithm three ways: statistically,

by running simulations, and by testing it against real data from the Network. *See generally,* DE 26-5. The false positive rate for real data testing was approximately 2%. *Id.* at 7.

The Affidavit further stated that, using this methodology, the FBI had identified IP address 75.74.45.172 ("the target IP address") as a node that had requested images of child pornography from the Network on three occasions. Aff. ¶¶ 25-29. Further investigation revealed that, on each of those occasions, this IP address was accessed from the Target Residence. *Id.* ¶ 33. The affiant, an experienced investigator of child pornography cases, opined that based on his training and experience the person using the target IP address was a collector of child pornography. *Id.* ¶ 41. He also opined that it was "highly likely" that the person had obtained child pornography through other means and was currently in possession of child pornography. *Id.* In conclusion, the Affidavit asserted that there was probable cause to believe that evidence of federal child pornography crimes would be found at the Target Residence. *Id.* ¶ 58.[4]

The warrant authorized the FBI to search the Target Residence. DE 26-1 at 25 (Attachment A to search warrant). It authorized the seizure of numerous items, including storage media, computers, records of occupancy, and photographs. *Id.* at 26-27 (Attachment B to search warrant).

*Execution of the Search and Mr. Sigouin's Statements*

On May 17, 2018, the FBI executed the search warrant at the Target Residence. During the execution of the warrant, Mr. Sigouin agreed to speak to the investigating agents. Those conversations occurred in a minivan parked outside the residence. There were three conversations. The first two were tape recorded. Govt. Ex. 7, 8. The third was not recorded but was memorialized in a Report of Interview by the interviewing FBI agent. Govt. Ex. 9. Prior to

---

[4] The Affidavit contained two paragraphs 58, both on page 21.

any questioning, Mr. Sigouin was read his *Miranda* rights and executed a form indicating he understood and waived those rights.   Govt. Ex. 11.   As most relevant here, Mr. Sigouin eventually gave the investigators the combination to a safe that was in his bedroom.  Inside the safe were computer storage devices containing images of child pornography.[5]  Mr. Sigouin also made other statements that indicated his familiarity with networks like the Network and that indicated he was aware that there was child pornography in the residence.   He now moves to suppress all physical evidence seized from the Target Residence.  He also moves to suppress his statements to the FBI.

## DISCUSSION

### 1.  Burdens of Proof

The evidentiary burden at a suppression hearing is a preponderance of the evidence.  *See United States v. Matlock,* 415 U.S. 164, 177 n.14 (1974).   On his Motions to Suppress, Mr. Sigouin bears the burdens of proof and persuasion. *United States v. Touset,* 890 F.3d 1227, 1231 (11th Cir. 2018) (individual challenging a search bears burdens of proof and persuasion).   To the extent he alleges his statements to the FBI were taken in violation of his *Miranda* rights, he bears the burden of proving that he was in custody when he made those statements.  *United States v. de la Fuente,* 548 F.2d 528, 533 (5th Cir. 1977); *United States v. Peck,* 17 F. Supp. 3d 1345 (N.D. Ga. 2014) (collecting cases).    The Government bears the burden of proving a knowing, voluntary, and intelligent *Miranda* waiver.  *Colorado v. Connelly,* 479 U.S. 157, 168 (1986). The Government also bears the burden of establishing the good faith and inevitable discovery exceptions to the exclusionary rule.  *See, e.g., United States v. Robinson,* 336 F.3d 1293, 1297

---

[5] For purposes of establishing standing for the Motions to Suppress, Mr. Sigouin stipulated that the items seized from the safe belonged to him.

(11th Cir. 2003) (good faith exception); *United States v. Drosten,* 819 F.2d 1067, 1070 (11th Cir. 1987) (inevitable discovery exception).

### 2. Motion to Suppress Physical Evidence

Mr. Sigouin argues that he had a reasonable expectation of privacy in the information his computer transmitted to the Network, so that the FBI's warrantless logging of that information through the FBI node was an unconstitutional search and seizure.   I find no constitutional violation occurred.

*Expectation of Privacy/Trespass*

There are two complementary theories under which the fourth amendment limits governmental action.  *United States v. Jones,* 565 U.S. 400, 406-07 (2012).   One is a property-based theory, under which the government is prohibited from trespassing into a location where a person has a property interest.  The other is a privacy-based theory, under which the government cannot invade a location where a person (1) has a subjective expectation of privacy and (2) that privacy expectation is objectively one that society will recognize as reasonable.  *See, e.g., United States v. Segura-Baltazar,* 448 F.3d 1281, 1286 (11th Cir. 2006).

Binding Eleventh Circuit precedent holds that there is no fourth amendment protection for information that a person freely shares with others on a publicly-accessible peer-to-peer network.  *United States v. Norman,* 448 Fed. Appx. 895, 897 (11th Cir. 2011); *see also United States v. Dennis,* No. 3:13-cr-10-TCB, 2014 WL 1908734, at *7 (N.D.Ga. May 12, 2014) (collecting cases).  In *Norman*, the Government accessed a shared-file folder on the defendant's computer and found child pornography on that computer.  The Eleventh Circuit held that the defendant had no objectively reasonable expectation of privacy in the folder because the

computer "contained a peer-to-peer file-sharing program—which Norman himself used-that allowed other public users of such software to access the shared files on his computer." *Id.*

Here, the government's conduct was no more intrusive than in *Norman.* Other than perhaps to obtain the list of neighbors,[6] the FBI did not extract information from (i.e. trespass into) Mr. Sigouin's computer. It did not obtain any information that was unavailable to other Network users. Mr. Sigouin's computer was operating in opennet mode. The FBI monitored and logged information that Mr. Sigouin's computer was voluntarily and openly making available to others on the Network.

*Norman* predated the Supreme Court's decision in *Jones,* so it did not discuss the trespass theory of the fourth amendment. Even under that theory (and assuming the FBI physically intruded into a portion of Mr. Sigouin's computer to get the list of neighbors), there was no fourth amendment violation. For fourth amendment purposes, a trespass involves an unlicensed physical intrusion into a constitutionally-protected area. *Florida v. Jardines,* 569 U.S. 1, 7 (2013). Like the peer-to-peer network in *Norman,* a fundamental structural concept of the Network is that each user makes a portion of his hard drive publicly available to all other users. By selecting the opennet mode, Mr. Sigouin voluntarily shared that portion of his hard drive with anyone who elected to join the Network, including complete strangers. Within the Network community (which was open to anyone who downloaded the free Network software), it was a public space, not a private, constitutionally-protected one. Even assuming the shared portion of the hard drive remained a constitutionally-protected space, Mr. Sigouin granted a license to

---

[6]It is not clear in the record how the FBI node obtains the list of the requestor's neighbors. The Affidavit makes clear, however, that this list is available to anyone on the Network, so long as the requestor is in opennet mode. *See* Aff. ¶¶ 14, 15.

anyone on the Network to access that portion of his hard drive.  For all these reasons, the FBI did not trespass if it retrieved the list of Mr. Sigouin's neighbors from the hard drive.

Mr. Sigouin makes two analogies to try to fit into existing fourth amendment protections. First, he argues that the modified software used by the FBI is an investigative tool unavailable to the general public, like the thermal imaging technology in *Kyllo v. United States,* 533 U.S. 27 (2001), and the dog sniff in *Jardines.*   Second, he argues that the information monitored by the FBI is equivalent to the contents of an email, the interception of which violates the Electronic Communications Privacy Act (ECPA).  Neither analogy holds.

*Kyllo* and *Jardines* are distinguishable.  Both of those cases involved a Government investigation directed at a residence.  The Supreme Court has long recognized that residences receive enhanced fourth amendment protection.  "[W]hen it comes to the Fourth Amendment, the home is first among equals."  *Jardines,* 569 U.S. at 6.  The majority in *Jardines* also relied on the fact that the investigating officers had trespassed into a protected area.  *Id.* 9-10.  Here, the Government's conduct was not directed at a home nor did the Government trespass into a protected area.

Additionally, the modified software did not give the FBI access to any information that others could not have obtained from the Network.   It merely made it easier for the FBI to analyze this data.  As Magistrate Judge Goodman explained in denying a motion to suppress in a case involving a peer-to-peer network:

> The enhanced law enforcement software used in this case did not search any areas of Gabel's computer, download any files, or otherwise reveal any information that was unavailable to ordinary [Network] users. Rather, the enhanced software allowed law enforcement to gather and evaluate publically available information

with greater efficiency and with an eye towards obtaining probative and admissible evidence of criminal activity.

*United States v. Gabel,* No. 10-60168, 2010 WL 3927697 (S.D. Fla. Sept. 16, 2010) (citation omitted), *report and recommendation adopted by* 2010 WL 3894134 (S.D. Fla. Oct. 4, 2010) (J. Cohn) *aff'd on procedural grounds,* 470 Fed. Appx. 853 (11th Cir. 2012).

Mr. Sigouin's ECPA argument fares no better. As Mr. Sigouin concedes, even if the government's conduct violated the ECPA, suppression is not an available remedy under the statute.  At oral argument, Mr. Sigouin's counsel clarified that Mr. Sigouin is not seeking suppression as a direct remedy for an ECPA violation.  Rather, his position is that the fact that ECPA protects the contents of electronic communications informs whether there is a fourth amendment expectation of privacy in those contents.

"Contents" of a communication include "any information concerning the substance, purport, or meaning of" a communication.  *See* 18 U.S.C. § 2510(8).  The modified software logged the following pieces of data from Mr. Sigouin's computer: (1) the number and identity of his neighbors, (2) the HTL count for the request, (3) the hash value of the block being requested, (4) Mr. Sigouin's computer's address on the Network, and (5) the date and time of the request. The HTL value, the network address, and the date and time of the request are necessary for the recipient node to process the request, including returning a block to the requestor if one is found. They are the equivalent of "dialing, routing, addressing, or signaling" information commonly obtained through a pen register, which is distinct from "contents."  *See* 18 U.S.C. § 3127(3). Similarly, the number and identity of Mr. Sigouin's neighbors do not contain any information that reflects the substance or meaning of a message.  This information also cannot fairly be considered "contents."

The hash value of the block is a closer question.  It is analogous to the file name of an email attachment.  Every communication over the Network is a request for a file block, so arguably implicit in sending the hash value is the statement, "I am looking for this block.  Please send it to me if you have it."  It also implicitly says, "If you don't have the block that corresponds to this hash value, please forward this request to your neighbors, unless the HTL value is now zero."  Even if the hash value constitutes contents and could not have been intercepted consistent with ECPA, Mr. Sigouin had no objective expectation of privacy.  Therefore, I do not reach the question of whether ECPA was violated.

The way the Network operates is to keep forwarding the hash value until the corresponding block is found.  Given the way in which file blocks are distributed around the Network, it is highly unlikely that a particular first generation neighbor will have the specific block being requested.  Therefore, the original sender (here Mr. Sigouin) must expect that the hash value will be communicated to multiple third-party peers, including people who are complete strangers.  As such, transmitting the hash value via the Network is the equivalent of loudly asking for something in a room full of strangers.  *See, e.g., Matter of John Doe Trader Number One,* 894 F.2d 240, 242-43 (7th Cir. 1990) (no constitutional protection for statement made on the crowded trading floor of Chicago Mercantile Exchange that was overheard and recorded by undercover FBI agent).  There is no objectively reasonable expectation of privacy.  Therefore, even assuming the communication of this hash value is protected by ECPA, it does not change the fourth amendment analysis; Mr. Sigouin has not cited any cases holding that it does**.**

Having concluded that the alleged ECPA violation does not affect the fourth amendment privacy analysis, I now turn to that analysis.  Under the applicable fourth amendment principles,

a person has a "reduced expectation of privacy in information knowingly shared with another." *Carpenter v. United States,* ___ U.S. ___, 135 S. Ct. 2206, 2219 (2018).  The mere fact that information is voluntarily shared with a third party does not, however, conclusively determine that the information loses all constitutional protection.  *See id.* at 2219-21   The extent of any residual fourth amendment protection depends, in part, on the nature of the particular item being shared.  *Id.*  In finding a constitutionally protected expectation of privacy in cell site location information held by a third party, *Carpenter* focused on the unique characteristics of long-term location information, including the highly-intrusive and intimate facts that can be drawn from that information.  *Id.* 2217-19; *c.f. United States v. Miller,* 425 U.S. 435 (1976) (no expectation of privacy in checks held by a bank); *Smith v. Maryland,* 442 U.S. 7365 (1979) (no expectation of privacy in dialed number sent to phone company for call routing).  The Supreme Court stressed that *Carpenter* was a narrow decision, limited to the particular technology and facts at issue.  138 S. Ct. at 2220.

Here, Mr. Sigouin voluntarily shared the alphanumeric hash value of a block.  That hash value communicates nothing about the content of the underlying file; it also communicates nothing else about the sender, other than perhaps the sender's desire to get a copy of the corresponding block.  In contrast, the location information in *Carpenter* "provide[d] an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'"  *Id.* 2217 (citing and quoting *Jones,* 565 U.S. at 415 (Sotomayor, J. concurring)).  Also, unlike using the cell phone in *Carpenter,* being able to reconstruct files distributed around the Network is not "'such a pervasive and insistent part of daily life' that [it] is indispensable to participation in modern society."  *Id.* 2220 (quoting *Riley v. California,* 573 U.S. 373, 385 (2014)).  Rather, the voluntary

disclosure of the hash value reveals even less about the sender (and is therefore less private than) the banking information in *Miller* and the phone routing information in *Smith* that were held to lack fourth amendment protection.

Considering all of these factors, Mr. Sigouin has not proven by a preponderance of the evidence that he held an objectively reasonable expectation of privacy in the information that his computer was transmitting and/or making freely available to his neighbors on the Network.  *See United States v. Ramos,* 12 F.3d 1019, 1023 (11th Cir. 1994) (movant bears burden of proving legitimate expectation of privacy in areas searched).  The government's warrantless monitoring of that information through the FBI node, even if it involved a physical intrusion into Mr. Sigouin's computer, did not violate the fourth amendment.  Suppression is not warranted on this basis.

*Probable Cause*

Mr. Sigouin next argues that the search warrant lacked probable cause to connect the residence to child pornography.  Probable cause for a search warrant exists where the facts and circumstances presented to the Court are sufficient "to warrant a man of reasonable caution in the belief that" a crime has been committed and that evidence, contraband, or instrumentalities of that crime exists at the location to be searched.  *See Carroll v. United States,* 267 U.S. 132, 162 (1925), *cited in Brinegar v. United States,* 338 U.S. 160, 175 (1949); Fed. R. Crim. P. 41(c). Probable cause may be predicated on hearsay or other evidence that would not otherwise be admissible at a trial.  *United States v. Ventresca,* 380 U.S. 102, 108 (1965).  "Reliance on the opinions and conclusions of trained and experienced law enforcement officers is appropriate." *United States v. Pineda*, No. 1:11-CR-00006-CAP, 2012 WL 2906758, at *9 (N.D. Ga. June 4, 2012) (collecting cases), *report and recommendation adopted*, No. 1:11-CR-0006-CAP-JFK,

2012 WL 2907447 (N.D. Ga. July 16, 2012).   Ultimately, in evaluating a proposed search warrant, the Magistrate Judge is "'simply to make a practical, common sense decision whether, given all the circumstances set forth in the Affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Jiminez,* 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting *Illinois v. Gates,* 462 U.S. 213, (1983)) (internal quotation marks omitted).

Mr. Sigouin argues that the Affidavit did not adequately consider or exclude the possibility that persons located outside the physical residence, or who did not reside there, could have accessed the Network through the target IP address.   While those scenarios are certainly possible, it was not necessary for the Affidavit to conclusively exclude them.   The same physical location was used to access the Network on three different occasions for the purpose of requesting child pornography.   Child pornography is the kind of material that someone generally downloads in a non-public place, like his own home.   Also, the items being downloaded here were videos, which do not lend themselves to a quick "drive-by" download through a random unsecure network in a residential community.   Moreover, accessing the Network requires a user to download specialty software.   The location in question was a private residence, not a public space where an open, unsecured Internet connection would be more likely.   The search warrant affiant was an experienced investigator of child pornography crimes.   *See* Aff. ¶ 2.   He swore, based on his training and experience, that it was "highly likely" that a person who would attempt to obtain child pornography as described in the Affidavit would be in possession of child pornography.   *Id.* ¶ 41.   He also explained that persons who obtain child pornography keep it for long periods of time, and "frequently" keep it in their homes.   *Id.* ¶ 40.   Considering the totality

of the evidence contained in the Affidavit, there was more than sufficient circumstantial evidence to establish probable cause that evidence of federal child pornography crimes would be found at the Target Residence.

Mr. Sigouin also argues that, at most, the Affidavit merely described a request for child pornography.  He asserts that there was no evidence of an actual download, so there was no probable cause to believe child pornography would be recovered at the Target Residence.  I disagree.  In light of the other facts in the Affidavit, I found the affiant's opinions and conclusions, which were based on his training and experience, to be sufficient to establish probable cause that evidence of federal child pornography crimes would be found at the Target Residence.

*Good Faith Exception*

Even if the search warrant lacked probable cause, suppression would not be required if the FBI relied in good faith on the existence of the warrant.  *United States v. Leon,* 468 U.S. 897 (1984).  As Magistrate Judge Maynard has cogently explained:

> Under the good faith exception, although evidence seized illegally ordinarily may not be used by the government in a subsequent criminal prosecution, "courts should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause."  Where a search warrant has been issued, the question becomes whether the officers executing the warrant relied in good faith on the issuing judge's determination of probable cause.  The good faith exception applies in all but four circumstances:
>
> (1) Where "the magistrate or judge in issuing a warrant was misled by information in an Affidavit that the affiant knew was false or would have

16

known was false except for his reckless disregard of the truth"; (2) "where the issuing magistrate wholly abandoned his judicial role" ...; (3) where the Affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid."

Whether these circumstances apply depends on the totality of circumstances surrounding issuance of the warrant.

*United States v. Morales*, No. 18-14056-CR, 2019 WL 572660, at *5–6 (S.D. Fla. Jan. 9, 2019) (citations omitted) (J. Maynard), *report and recommendation adopted,* No. 18-CR-14056, 2019 WL 210717 (S.D. Fla. Jan. 16, 2019) (J. Rosenberg).

Mr. Sigouin challenges the good faith exception on three grounds: (1) that material facts were omitted from the Affidavit, in violation of *Franks v. Delaware,* (2) that that warrant was so factually deficient that it could not support a probable cause finding, and (3) that I was not able to act as a neutral and detached reviewer because of the "complexity and technical nature of the determination with which the magistrate was tasked and the conclusory nature of the Affidavit". DE 20 at 22.  All of these arguments fail.

First, there was no *Franks* violation.  Mr. Sigouin points to five statements in the Affidavit which he asserts were misleading or false.  They are: (1) paragraph 6 of the Affidavit incorrectly states that the Network exists for the purpose of sending and receiving child pornography; (2) the Affidavit does not support an inference that the user of the target IP address distributed child pornography, as alleged in paragraph 6 of the Affidavit; (3) paragraph 13 of the Affidavit misstates how each member of the Network sets the default HTL; (4) paragraph 19 of the Affidavit incorrectly states that the FBI node only collects information that is also available to other users of the Network; and (5) paragraph 41 of the Affidavit incorrectly states that the

user of the target IP address was a collector of child pornography. Mr. Sigouin has not met his burden of showing by a preponderance of the evidence that these statements were false, let alone that they were made intentionally or with reckless disregard for the truth. Moreover, none of these statements were material to my conclusion that there was probable cause to support the search warrant.

Second, the Affidavit, including the peer reviewed paper, contained sufficient detail to establish probable cause and for me to understand and evaluate the issues presented. At its core, the factual basis for the warrant was that (1) the Network was a common platform for the storage and transfer of child pornography, (2) the FBI had logged certain information transmitted from the Target IP address over the Network, (3) a reliable mathematical algorithm predicted that a computer exhibiting the characteristics of the target IP address was likely attempting to download child pornography from the Network. Taken together, these facts easily established probable cause that the target IP address was being used to try to access child pornography. Additionally, for the reasons stated above, there was probable cause that evidence of this crime would be found at the residence associated with that IP address.

Although the underlying algorithm relied upon advanced mathematics, the evidence presented to the Court was paradigmatic circumstantial inference: a series of circumstances that imply a likely result. *See* Eleventh Circuit Pattern Jury Instructions (Criminal) B4 (2019) ("'Circumstantial evidence' is proof of a chain of facts and circumstances that tend to prove or disprove a fact."). Finders of fact routinely rely on circumstantial evidence. *Id.* ("There's no legal difference in the weight you may give to either direct or circumstantial evidence.").

An analogous example is DNA comparison evidence. DNA analysis relies on advanced biochemistry and genetics, but a judge need not be a biochemist or geneticist to rely upon this

kind of evidence.  I know from personal experience that courts regularly receive (and rely on) sworn affidavits in support of search warrants or arrest warrants stating that a particular person is linked to a location or evidence because of a DNA match.  These affidavits will include a representation that the affiant has been told by someone who understands how DNA analysis works that there is an astronomically-low mathematical likelihood that the DNA match is in error.[7]  If the court credits the hearsay representation in the affidavit, the DNA evidence can be used to find probable cause.

The same methodology applies here.  I reviewed the peer reviewed paper along with the Affidavit.  The Affidavit contained sufficient support for a conclusion that the algorithm's prediction was reliable. *See* Aff. ¶ 23.  My review of the peer reviewed paper confirmed that the statements in the Affidavit accurately reflected the paper's findings.  Ultimately, the peer reviewed paper and the Affidavit credibly established a false positive rate of approximately 2%. DE 26-5 at 7-8.  Put differently, there was less than a 2% probability that the algorithm was wrong to conclude that the target IP address was the requestor of digital images of child pornography.  Although probable cause cannot be reduced to a specific percentage, the materials submitted to the Court were understandable and were more than sufficient to establish probable cause.

In sum, the FBI agents acted in good faith reliance on the Court's warrant.  The Motion to Suppress on this basis should be denied.

---

[7] Whether the DNA error rate is, in fact, astronomically low is an issue for another day.  *See, e.g.,* Leonard Mlodinow, *The Drunkard's Walk.  How Randomness Rules Our Lives,* pp. 35-37 (2008); Jordan Ellenberg, *How Not to Be Wrong.  The Power of Mathematical Thinking,* p. 170 (2014).

### 3.   Motion to Suppress Statements and Physical Evidence Derived From Them

Mr. Sigouin argues that while he was in custody he made equivocal requests to invoke his *Miranda* rights, which should have limited the questioning by the FBI agents.  As a threshold matter, I find that Mr. Sigouin has not met his burden of proving he was in custody at the time he made his statements to the FBI, so his *Miranda* rights never attached.

"[W]hether a suspect is 'in custody' is an objective inquiry. . .  'Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'"  *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (citations omitted).   The circumstances surrounding the questioning of Mr. Sigouin are as follows.

The FBI search team arrived at the Target Residence at approximately 6:00 am.  After the FBI made contact with Mr. Sigouin and the other residents of the house, they invited Mr. Sigouin to talk to them inside of a minivan that was parked in front of his residence.  He was seated in the front passenger seat.  One FBI agent sat in the driver's seat.  The other sat in the rear passenger seat.  Mr. Sigouin was never handcuffed.  No guns were drawn.  Without any prompting, Mr. Sigouin asked if he was under arrest; the agents told him he was not.  They told him multiple times that he could halt the questioning or leave the van.  There was no physical impediment to him simply opening the car door and getting out.  The agents did not raise their voices or otherwise threaten Mr. Sigouin.  At approximately 6:35 am, they read him his *Miranda* rights; this interaction was captured on the audio tape.  There was nothing coercive or threatening about the way the agents explained the rights.  At approximately 6:51 am, Mr. Sigouin unambiguously

terminated the discussion.  The agents honored his request.  They did not try to convince him to keep talking.

Mr. Sigouin remained in the van.  He did not ask to leave.  At approximately 7:25 am, he reinitiated the conversation with the agents by asking about making a deal.[8]  At approximately 7:35 a.m., Mr. Sigouin asked to shut off the tape recorder.  The agents complied with that request.  After about 10 minutes, Mr. Sigouin began talking about the case, including the possibility of making a deal for cooperation.  At one point he asked the agents if they thought it would be in his best interest to speak to a lawyer before providing the combination to the safe in the Target Residence. Govt. Ex. 11.  Special Agent Alfin responded that Mr. Sigouin did not have to provide the safe combination and that he could speak to a lawyer if he wanted. *Id.*  Mr. Sigouin asked if a lawyer could stop the FBI from executing the search warrant.  Special Agent Alfin replied that a lawyer could not stop the search but that Mr. Sigouin could speak to a lawyer before making any further statements. *Id.*  Mr. Sigouin then provided the safe combination and made subsequent admissions about having possessed and obtained child pornography.

I find, given the totality of the circumstances, that a reasonable person in the same situation would have believed he was free to stop the questioning and get out of the van. Therefore, Mr. Sigouin was not in custody.  Although the FBI agents informed Mr. Sigouin of his *Miranda* rights, those rights never attached.

Alternatively, even if Mr. Sigouin's *Miranda* rights attached, I find that he initially knowingly, voluntarily, and intelligently waived those rights.  He later twice invoked his right to

---

[8] I specifically credit the following testimony of Special Agent Alfin: (1) Mr. Sigouin reinitiated the conversation without prompting from the agents, (2) Mr. Sigouin never asked to get out of the van, and (3) although the agents remained in the van with Mr. Sigouin between approximately 6:51 a.m. and approximately 7:25 a.m., they did not have conversation with him or conversation with each other about the case.

silence.  On both occasions, the agents honored that invocation.  Because Mr. Sigouin subsequently reinitiated conversation, the agents were within their authority to continue questioning him.  *See, e.g., United States v. Muhammad,* 196 Fed. Appx. 882 (11th Cir. 2006).

Mr. Sigouin asserts that he made an ambiguous request for counsel and an ambiguous request to halt questioning, so the FBI agents should have halted questioning to clarify his intentions.  *See generally* DE 21.  An equivocal invocation of *Miranda* rights does not require investigators to terminate questioning.  *Davis v. United States,* 512 U.S. 452, 458-59 (1994) (right to counsel); *Berghuis v. Thompkins,* 560 U.S. 370, 381-82 (2010) (right to remain silent). Whether a defendant has invoked his *Miranda* right is an objective inquiry.  *Davis,* 512 U.S. at 458-59.  As the Supreme Court explained in *Davis,* a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect. We decline petitioner's invitation to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney." *Id.* 459 (citations omitted).  The same is true for the right to counsel.  *Berghuis,* 560 U.S. at 381 ("[T]here is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*.").  All of the cases cited by Mr. Sigouin predate *Davis* and *Berghuis*, and therefore are no longer good law.  Because Mr. Sigouin concedes that his invocation of his *Miranda* rights was, at best, equivocal, he cannot meet his burden of showing that the continued questioning violated those rights.

Finally, the Government argues that the inevitable discovery doctrine would preclude suppression of the physical evidence found in the safe even if Mr. Sigouin's right to counsel was violated.   The inevitable discovery doctrine requires the Government to prove by a preponderance of the evidence that the evidence in question would ultimately have been discovered by lawful means and that those lawful means were being actively pursued at the time the defendant's rights were violated.   *See, e.g., United States v. Virden,* 488 F.3d 1317, 1322 (11th Cir. 2007).   I find that the Government has met its burden of showing that the inevitable discovery doctrine applies.   A search warrant had been issued for the entirety of the Target Residence.   It authorized seizure of items that could have fit into the safe, such as computer storage devices and documents.   The existing search warrant provided all the lawful means necessary for the FBI to open the safe.   There was nothing left to pursue.   A team of agents was actively executing the warrant while Mr. Sigouin was being questioned.   Special Agent Alfin testified credibly and without contradiction that the FBI had the capability to open the safe without the combination that Mr. Sigouin provided, and that it would have used that capability if necessary.

Mr. Sigouin argues that the inevitable discovery doctrine does not apply because the existing search warrant was insufficient and the FBI was not actively pursuing an additional warrant for the safe.   A warrant to search a premises includes the authority to open containers that could contain objects whose seizure is authorized by the warrant, including opening locked containers.   *See, e.g., United States v. Gonzalez,* 940 F.2d 1413, 1420 (11th Cir. 1991).   No additional warrant was required.

### 4.   Motion to Suppress Statements as Not Voluntary

Mr. Sigouin argues that his *Miranda* waiver and his statements to the FBI were not voluntary because he was under the influence of pain medications and was coerced.   At the suppression hearing, Mr. Sigouin introduced testimony from his treating psychiatrist that, at the time of the search, he had been prescribed a cocktail of opiates and benzodiazapenes for pain, insomnia, and anxiety.   The treating psychiatrist credibly testified that these medications could cause a patient to be inattentive and drowsy.   He also credibly testified that each patient reacted to these medications in an individualized manner, depending on many variables.   He did not have personal knowledge of which specific medications Mr. Sigouin had taken on the night before the search, nor did he observe Mr. Sigouin at the time of the search.   Therefore, his testimony, while credible, had minimal probative value.

The Court was able to listen to two recorded discussions between Mr. Sigouin and the FBI agents.   Govt.. Ex. 7, 8.   During these conversations, Mr. Sigouin was coherent, intelligible, and responded appropriately to the agents' questions.   His voice was strong, not slurred.   He did not become disoriented.   Rather, he asked his own questions which I find were tactically designed to try to discern what the FBI knew and what they were investigating.   I find that the statements to the FBI were knowingly and voluntarily made.   Mr. Sigouin has not met his burden of proving otherwise.

### <u>RECOMMENDATION</u>

Mr. Sigouin has failed to meet his burden of showing that either the physical evidence or his statements should be suppressed. Therefore, it is **RECOMMENDED** that his Motions to Suppress [DE 20, 21, 22, 32] be **DENIED**.

## NOTICE OF RIGHT TO OBJECT

Given the pending trial date of January 6, 2020, I find that the interests of justice justify a shortened period for objections.  *See* Local Magistrate Judge Rule 4(a) (Magistrate Judge may change the deadline for objecting to a Report and Recommendation). Therefore, a party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Robin L. Rosenberg, United States District Court Judge for the Southern District of Florida, **on or before December 27, 2019, at 5:00 p.m.  An objecting party shall promptly arrange for transcribing the testimony from the suppression hearings.  *See* Fed. R. Civ. P. 72(b)(2). Any response shall be filed on or before January 2, 2019 at 5:00 p.m.**  Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**If counsel do not intend to file objections, they shall file a notice advising the District Court within FIVE DAYS of this Report and Recommendation.**

**DONE AND SUBMITTED** in Chambers this 18th day of December, 2019, at West Palm Beach in the Southern District of Florida.

_____

BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE